**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **BISMARK BOA-BONSU,** | : | |
| | : | |
| **Plaintiff-Petitioner,** | : | |
| | : | **Case No. 2:25-cv-00632** |
| **v.** | : | |
| | : | **Judge Algenon L. Marbley** |
| **DEBORAH OWUSU,** | : | **Magistrate Judge Chelsey M. Vascura** |
| | : | |
| | : | |
| **Defendant-Respondent.** | : | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on Petitioner's request for the return of a child pursuant to the Hague Convention on the Civil Aspects of International Child Abduction and motion for preliminary injunction. (ECF Nos. 1; 4). With the consent of the parties, the hearing on Petitioner's motion for a preliminary injunction was consolidated with the trial on the merits of the Petition. (ECF No. 45).

This Court conducted a full evidentiary hearing, following which both parties submitted post-hearing briefs, including proposed findings of fact and conclusions of law. Having carefully considered the evidence, the parties' submissions, and the applicable legal standards, and for the reasons set forth below, this Court **DENIES** Petitioner's Petition for Return of Child.

## I.     FINDINGS OF FACT

Plaintiff/Petitioner Bismark Boa-Bonsu ("Petitioner") and Defendant/Respondent Deborah Owusu ("Respondent") are the parents of an eight-year-old child, B.B., born in Finland in 2016. (ECF Nos. 1 ¶ 8; 24 ¶ 8; 61 at 164). B.B. has permanent residency in Finland and had lived there

his entire life. (ECF Nos. 1 ¶ 11; 24 ¶ 11; 61 at 41).  The parents were married at the time of B.B.'s birth and divorced in 2019. (ECF Nos. 1 ¶ 9; 24 ¶ 9; 61 at 31).

During their marriage, the parties experienced "difficulties" and "misunderstandings," (ECF No. 61 at 32, 92-94), including incidents of alleged domestic violence. (ECF No. 61 at 32, 91-94). Respondent ultimately sought shelter care, taking B.B. and B.B.'s stepbrother with her. Before entering the shelter, however, Respondent left the children in Petitioner's care.  (*Id*. at 33-34; ECF No. 52 at 248-49).

Following the divorce, the parties entered into an Agreement on Child Custody and Right of Access, which was confirmed by the Finnish child welfare authority ("Custody Agreement"). (ECF No. 61 at 46; P-13[1]). The Agreement granted both parents custody and established a visitation schedule under which B.B. would reside with Respondent Monday through Friday and with Petitioner every other weekend from Friday to Sunday. (ECF No. 61 at 100; P-13). Petitioner testified that he initially exercised visitation consistently, but over time, difficulties emerged. (*Id*. at 102).

Petitioner also purchased a phone for B.B., through which they communicated daily.  (ECF No. 52 at 58). In February 2024, Petitioner observed that the phone's location had changed from Finland to Germany. He attempted to contact B.B. but received no response. (ECF No. 61 at 62). He states that he has not been able to contact B.B. on the phone since. (*Id.*). Petitioner testified that after B.B. returned from Germany, Petitioner occasionally visited him at school, doing so "more than five times" between February and May. (*Id*. at 64).

---

[1] "P-" refers to Petitioner's hearing exhibits.

In March 2024, Petitioner contacted Finnish social welfare services to schedule an appointment to address the Custody Agreement. (ECF No. 61 at 65-66; P-26). A joint meeting between Petitioner and Respondent was scheduled for June 10, 2024. (ECF No. 61 at 68; P-25). Although Respondent was aware of the meeting, she did not attend. She later explained that she had not agreed to the meeting and that she had already left Finland for Mexico. (ECF No. 52 at 257). She acknowledged that Petitioner was, at the time, seeking expanded visitation with B.B. and that, once she was in the United States, she knew Petitioner wanted B.B. to return to Finland. (*Id.* at 258; ECF No. 61 at 52). She did not, however, inform Petitioner of her departure. (ECF No. 61 at 81).

After Respondent failed to attend the June 10, 2024 meeting with Finnish social welfare authorities, Petitioner was directed to file a case in the Helsinki District Court. He did not do so. Instead, he reported the situation to his social worker, who attempted to schedule a meeting with a family mediator, but Respondent remained unavailable. (ECF No. 61 at 79). Concerned, Petitioner visited Respondent's apartment with his social worker, and contacted the police. Upon entry, police observed that the apartment appeared vacated, with packaged belongings and some remaining clothing. Petitioner subsequently filed a formal police report on August 13, 2024. (*Id.* at 80; P-38).

Petitioner was eventually notified by police that Respondent and B.B. had traveled to the United States. He was referred to the Ministry of Justice, which provided him with a Hague Convention Request for Return form. (ECF No. 61 at 82–83; P-14). Petitioner completed the form and understood that the Ministry submitted it to the United States Department of State. (ECF No. 61 at 82–83; P-14).

On June 6, 2025, Petitioner filed a petition with this Court for the return of the child under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq. (ECF No. 1). Petitioner also filed a Motion for Preliminary Injunction requesting expedited proceedings and an order preventing the removal of B.B. from this Court's jurisdiction while the petition was pending. (ECF No. 4).

This Court granted the request for an expedited hearing, scheduled proceedings to begin on August 11, 2025, and ordered the parties to complete briefing of the motion for preliminary injunction. (ECF Nos. 18, 23). Petitioner further requested consolidation of the preliminary injunction hearing with a trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). (ECF No. 4). Respondent did not oppose. (ECF No. 23). Accordingly, the August 11, 2025 hearing was consolidated with the trial on the merits pursuant to Rule 65 (a)(2).[2] (*Id*.). Subsequently, the Court conducted an *in-camera* interview of B.B. where he articulated objections and demonstrated maturity. (ECF No. 53).

## II.    CONCLUSIONS OF LAW

The Hague Convention on the Civil Aspects of International Child Abduction is designed to "secure the prompt return of children wrongfully removed to or retained in any Contracting

---

[2] Rule 65 of the Federal Rules of Civil Procedure allows for consolidation of a preliminary injunction hearing with the trial on the merits. Fed. R. Civ. P. 65(a)(2). Moreover, at issue here is a child-abduction case under the Hague Convention, which instructs courts to "act expeditiously in proceedings for the return of children." Hague Convention, art. 11. Accordingly, courts often consolidate the trial on the merits with the preliminary injunction hearing. *See Miller v. Miller*, 2018 WL 4008779, at *1 (E.D. Tenn. Aug. 22, 2018); *Ahmed v. Ahmed*, 2016 WL 4691599, at *1 (E.D. Tenn. Sept. 7, 2016); *Guevara v. Soto*, 180 F. Supp. 3d 517, 522 (E.D. Tenn. 2016).

State" and to "ensure that the rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Hague Convention, art. 1). As the Sixth Circuit has explained, the Convention aims "to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Panteleris v. Panteleris*, 601 F. App'x 345, 347 (6th Cir. 2015) (quoting *Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir. 1996) ("*Friedrich II* ")).

Under the Hague Convention, a child abducted in violation of rights of custody must be returned to the child's country of habitual residence, unless certain exceptions apply. *Id*. (citing *Abbott*, 560 U.S. at 5). Such exceptions require respondent to establish that: (1) the petitioner was not actually exercising custody rights at the time of removal or retention; (2) the petitioner had consented to or subsequently acquiesced in the removal or retention; (3) more than one year has passed from the time of the wrongful removal or retention until the date the petitioner commenced a judicial proceeding; (4) there is a grave risk that the child's return would expose the child to physical or psychological harm; (5) the objection of a mature child exists; or (6) that the return of the child would subject the child to violation of basic human rights and fundamental freedoms. Hague Convention, art. 13, 22 U.S.C. § 9003(e)(2).

To establish a prima facie case of wrongful removal, a petitioner must prove by a preponderance of the evidence that: (1) the respondent removed the child from that child's habitual residence; and (2) the petitioner was exercising his parental custody rights, under the law of the State of the child's habitual residence, over the child at the time of the removal. *Panteleris*, 601 F. App'x at 348; *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993); *see also Minette v. Minette*, 162 F. Supp. 3d 643, 645 (S.D. Ohio 2016); 42 U.S.C. § 11603(e)(1)(A). "Once the

5

petitioner establishes wrongful removal, the burden shifts to the respondent to establish an exception." *Panteleris*, 601 F. App'x at 348.

## A. Wrongful Removal

Under the Convention, a removal is "wrongful" when it occurs in violation of custody rights actually exercised, or that would have been exercised, by the non-removing parent under the law of the child's habitual residence at the time of the removal. *Friedrich II,* 78 F.3d at 1064. Once a court determines that the petitioner exercised custody rights in any manner, the court does not consider whether the parent exercised the custody rights well or badly because those matters go to the merits of the custody decision and are, therefore, beyond the subject-matter jurisdiction of the federal courts. *Id.* at 1066 (citing 42 U.S.C. § 11601(b)(4), *recodified at* 22 U.S.C. § 9001(b)(4)).

Accordingly, this Court's wrongful removal analysis turns on three questions: (1) B.B.'s habitual residence; (2) Petitioner's custody rights; and (3) Petitioner's exercise of those rights.

### 1. Habitual Residence

As an initial matter, the Sixth Circuit has held that "a child's habitual residence is the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *Panteleris*, 601 F. App'x at 349 (quoting *Simcox v. Simcox*, 511 F.3d 594, 602 (6th Cir. 2007) (quoting *Robert v. Tesson*, 507 F.3d 981, 998 (6th Cir. 2007). "B.B. lived his entire life in Finland prior to leaving for the United States of America" (ECF No. 31 ¶ 2), and the parties agree that B.B.'s habitual residence is Finland. (ECF No. 1 ¶ 24; 30 ¶ 24).

### 2. Custody Rights

Turning next to rights of custody, Petitioner bears the burden of establishing that he had custodial rights pursuant to the laws of the country of the child's habitual residence. *Pliego v. Hayes*, 86 F. Supp. 3d 678, 697 (W.D. Ky. 2015). Such rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of the State." *Friedrich II,* 78 F.3d at 1064.

Article 5(a) of the Hague Convention defines "rights of custody" to include rights relating to the care of the child, including, in particular, the right to determine the child's place of residence. Importantly, the remedy prescribed by the Convention for wrongful removal or retention is the child's return to the country of habitual residence, which preserves the status quo ante without modifying the pre-abduction custody allocation. Custody decisions remain the exclusive decision of the courts in the child's habitual residence. *See Abbott*, 560 U.S. at 9. !

Relevant in the case *sub judice* is Section 7 of Finland's Act on Child Custody and Right of Access, which provides that parents may agree to joint custody while the child resides with one parent. Section 7 further states that "[t]he parents may agree that a child has the right to maintain contact and meet with the parent with whom he or she does not reside."

Petitioner's custody rights arise from the Custody Agreement signed by him and Respondent, which was confirmed by the relevant social welfare authority. (ECF Nos. 4 at 7; 1-5; 52 at 205; 51 at 45; P-13). The agreement reflects that the parties "agreed on the details of the right of access and visiting." It declared that "[c]hild custody is granted to both parents together." (P-13). It further provides that Petitioner and Respondent "agreed on [their] child's visitation rights

7

and right to keep in touch with the father" and states that "[t]he child shall have access and visitation rights" with Petitioner "on two weekends of every month . . . ." (P-13 at 3).

Respondent concedes that there was a shared parenting agreement between her and Petitioner but argues that the rights were terminated. (ECF Nos. 30 at 2; 52 at 241). She contends that Petitioner's custody rights had ceased at the time B.B. was removed, asserting that Petitioner had no rights to the child or parenting time. (ECF No. 30 at 2). During the hearing, Respondent testified that the custody agreement was replaced by a different agreement. (ECF No. 52 at 241). Respondent, however, has provided no subsequent custody agreement or other evidentiary support for this claim for this Court's consideration. Moreover, during the hearing, Respondent also testified that Petitioner never forfeited his custody rights, that there is no court order or child services agreement prohibiting Petitioner from seeing B.B., and that she never sought to have Petitioner's custody rights revoked. (ECF No. 52 at 242). Rather, at all times B.B. was in Finland, Petitioner "had authority" to see B.B. (*Id.*).

As such, without any further evidence to the contrary, the Custody Agreement supports a finding that Petitioner had rights of custody under Finnish law.

### 3. Exercise of Rights

The Hague Convention "protects rights of custody when 'at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.'" *Abbott*, 560 U.S. at 13 (quoting Hague Convention Art. 3). Accordingly, to establish wrongful removal under the Convention, Petitioner must demonstrate that he was exercising his custody rights at the time of B.B.'s removal, or would have exercised them but for the removal.

Petitioner testified that, before B.B.'s removal in 2024, he spent time with the child, including outings to a shopping mall and a local playground. (ECF No. 61 at 58). He further testified that he purchased a cell phone for B.B. in 2023 and maintained daily communication. (*Id*.). Respondent's testimony corroborated this, acknowledging that Petitioner had contact with B.B. through in-person visits, phone calls, and occasional text messages. Although she claimed the visits were "not in an appropriate way," she admitted that the contact occurred. She also confirmed that Petitioner saw B.B. at least once at school in 2024, the same year she left Finland. (ECF No. 52 at 242-43).

Nevertheless, Respondent contends that Petitioner failed to exercise his custody rights based on extended periods without contact, missed visitation, lack of knowledge about the child's schooling, and limited involvement after she left the marital residence. (ECF No. 59 at 4). When asked about Petitioner's contact with B.B. from 2022 until her departure from Finland, Respondent testified that Petitioner would see the child sporadically, sometimes going three to six months without contact. (ECF No. 52 at 212). She stated that his visitation was not consistent and noted that, for example, Petitioner was unaware of the child's school or class information and only inquired about it in January 2024. (*Id*.). Respondent further testified that the petitioner last saw B.B. at his school in January or February 2024, after their return from Germany, and that prior to that visit, he had not seen the child for approximately six months. (ECF No. 52 at 213). Indeed, Petitioner confirmed that a custody agreement was established in 2019 and that he had contact with the child within the past year. (ECF No. 61 at 102–104).

While these assertions raise questions about the consistency and quality of Petitioner's involvement, they do not support a finding that he failed to "exercise" custody rights under the

Convention. As the Sixth Circuit has held, "if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child." *Friedrich II*, 78 F.3d at 1066. The court further clarified that "[a]lthough there may be situations when a long period of unexplainable neglect of the child could constitute non-exercise of otherwise valid custody rights under the Convention, as a general rule, any attempt to maintain a somewhat regular relationship with the child should constitute 'exercise.'" *Id*.

Petitioner's actions do not demonstrate a clear and unequivocal abandonment. Rather, the evidence demonstrates that Petitioner made efforts to remain involved in B.B.'s life. At the hearing, Petitioner acknowledged that while visitation was initially consistent, it became strained due to conflicts between the parties. He denied abandoning his parenting time or failing to maintain contact. (ECF No. 61 at 102–04). Most significantly, Respondent testified that Petitioner was seeking weekly parenting time before she removed B.B. and she confirmed that Finnish child services were involved in revising custody agreements.  (ECF No. 52 at 258). While the evidence raises questions about the consistency and meaningfulness of Petitioner's involvement in B.B.'s life, the Sixth Circuit has made clear that once a court "determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." *Friedrich II*, 78 F.3d at 1066.

This Court finds that Petitioner has presented sufficient evidence to establish that he held custody rights and was exercising them at the time of B.B.'s removal. Accordingly, the burden now shifts to Respondent to establish an applicable exception under the Hague Convention. *See*

*Panteleris*, 601 F. App'x at 348.

## 2. Affirmative Defenses

When a child is "wrongfully removed or retained within the meaning of the Convention" the child must "be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C § 9001. Respondent invokes five affirmative defenses in her Answer: (1) lack of subject matter jurisdiction; (2) consent; (3) grave risk of harm; (4) the child's objection; and (5) equitable estoppel. (ECF No. 24).

Turning first to the issue of subject matter jurisdiction, Respondent fails to assert a basis on which this Court would lack jurisdiction. ICARA provides that state and federal courts have concurrent jurisdiction over claims brought under the Convention. 22 U.S.C. § 9003(a). *See Chafin v. Chafin*, 568 U.S. 165, 169 (2013) (noting that under ICARA, courts are directed to "decide the case in accordance with the Convention"). As to the last defense, the equitable estoppel defense, this Court previously granted Petitioner's motion to strike that defense, observing that the Hague Convention provides only a limited set of affirmative defenses, and courts hold that equitable estoppel is not among them.[3] (ECF No. 42). This Court considers each defense in turn, and finds that Respondent raises an adequate defense based on B.B.'s objection.

The remaining defenses asserted by Respondent—consent, grave risk of harm, and the child's objection—are among those recognized by the Convention, but such exceptions are "narrowly construed." *Friedrich II*, 78 F.3d at 1067.

---

[3] *See, e.g.*, *McCurdy v. Shreve-McCurdy*, 806 F. Supp. 2d 1010, 1021 (E.D. Mich. 2011) ("'Equitable estoppel' is simply not one of the narrow defenses set forth in the Hague Convention. Respondent has not supplied the Court with any legal authority to show that this Court has the authority to decline to order the child returned based on a theory of equitable estoppel"); *Garcia v. Pinelo*, 122 F. Supp. 3d 765, 785 (N.D. Ill.), aff'd, 808 F.3d 1158 (7th Cir. 2015) ("There is therefore no basis on which to conclude that the drafters of the Convention intended to include these background equitable defenses in the Hague Convention.").

*a. Consent*

In her Answer, Respondent asserts that Petitioner consented to B.B.'s removal from Finland. (ECF No. 24). Under the Hague Convention, the defense of consent requires the respondent to establish, by a preponderance of the evidence, that the petitioner agreed to the removal or retention of the child.  22 U.S.C. § 9003(e)(2)(B); *Friedrich II*, 78 F.3d at 1067. Respondent, however, offers no evidence in support of this defense beyond her bare assertion in the pleadings.

To the contrary, Respondent's own testimony undermines the claim of consent. When asked whether she informed Petitioner of her decision to leave Finland with B.B., she testified unequivocally that she did not:

> Q: You did not tell Mr. Petitioner that you were leaving Finland?
> A: No.
> Q: You could have told him?
> A: No.
> Q: You did not get approval from Finnish child protective services to relocate to the United States?
> A: No.
> Q: You didn't get approval from a Finnish court?
> A: No.
> Q: And Mr. Boa-Bonsu did not consent to B.B.'s removal?
> A: I don't know. And I didn't need his consent because this was about my life.

(ECF No. 52 at 258-60). Respondent later confirms that Petitioner did not tell her that he would consent to removing B.B. from Finland. (*Id.* at 260). This testimony directly contradicts any suggestion that Petitioner consented to B.B.'s removal. Respondent neither sought nor obtained his permission, nor did she attempt to notify him before relocating. Respondent further acknowledged that, after relocating to the United States, she was aware that Petitioner wanted B.B. returned to Finland. (*Id.* at 210). She confirmed that she had communications with the U.S. State

Department regarding the matter, received a letter from the Department, and submitted a response. This exchange demonstrates that Petitioner promptly objected to the removal and took steps toward securing B.B.'s return, further undermining any claim that he consented to B.B.'s removal.

Accordingly, the Court finds that Respondent has failed to meet her burden of proof on the consent defense.

### b. *Grave Risk of Harm*

Under Article 13(b) of the Hague Convention, return is not required if the respondent shows by clear and convincing evidence that there is a grave risk that the return of the child would expose the child to physical or psychological harm. Hague Convention, art. 13(b), 22 U.S.C. § 9003(e)(2)(A). The Sixth Circuit has cited the following guidance for a court's determination on the grave risk of harm exception:

> This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.
>
> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

*Friedrich II*, 78 F.3d at 1068–69 (quoting Public Notice 957, 51 Fed. Reg. 10494, 10510 (Mar. 26, 1986)). The court further found that:

[A] grave risk of harm for the purposes of the Convention can exist in only two

13

situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger *prior* to the resolution of the custody dispute—*e.g.,* returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection.

*Id*. at 1069.

Respondent argues that Petitioner's exposure of B.B. to domestic violence satisfies the grave risk of harm exception under the Hague Convention. (ECF No. 59 at 5). At the hearing, Respondent testified that there was constant physical and emotional abuse. (ECF No. 61 at 164). She explained that Petitioner "was drinking a lot" (*Id*. at 166). She alleges that in 2017, after B.B. was born, she traveled to Italy for one to two months at the invitation of Petitioner's mother due to experiencing emotional trauma and stress. (*Id*. at 168). The issues, however, persisted upon her return to Finland and she recounted an incident in 2017 in which Petitioner physically assaulted her late at night after coming home from work and drinking alcohol. (*Id*.). She testified that he started attacking her for no reason and pushed her out of the house but left B.B. behind. (*Id*. at 169). Respondent stated that she encountered police nearby, who accompanied her back to retrieve B.B. who was about two years old at the time and Respondent did not think he remembered the incident. (*Id*. at 170-71). She testified that Petitioner apologized to the police and promised not to repeat the behavior. (*Id*.).

She also recounted another incident when she went to Petitioner's house with a companion in 2023 to pick up B.B., Petitioner followed her to the roadside and followed her and a companion to her car. He appeared highly intoxicated and attempted to enter the vehicle without permission. (*Id*. at 175). According to Respondent, Petitioner began shouting, arguing with her companion, and punching the car. She asked him to leave the vehicle, but he refused. In an effort to distract

14

B.B. from the escalating situation, she handed the child her phone. After the situation continued, B.B. himself called the police. Upon their arrival, the vehicle's windshield had been broken, and Petitioner had fled to his home with the car keys. (*Id*. at 176). Respondent emphasized that this incident occurred in B.B.'s presence and confirmed that Petitioner was intoxicated while the child was in his care. (*Id*. at 176-77).

Even if this Court accepts as true the allegations of abuse and drinking behavior from 2017 and 2023, these incidents do not rise to the level of a viable defense under the Hague Convention. *See, e.g.*, *Salame v. Tescari*, 29 F.4th 763, 768 (6th Cir. 2022) ("[O]ne incident of abuse falls into the relatively minor category, and we echo its comment that calling such abuse 'relatively minor' does not mean we find any type, level, or frequency of abuse acceptable. Rather, the abuse does not rise to the level of a viable defense to the children's return under Article 13(b).").

For example, in *Simcox*, the Sixth Circuit found that the respondent established by clear and convincing evidence that there was a grave risk of harm but the children may nonetheless be returned when the petitioner abused the children physically—through repeated beatings, hair pulling, ear pulling, and belt-whipping—and psychologically—through profane outbursts and abuse of the children's mother in their presence. *Simcox*, 511 F.3d at 609. The court noted the significance of its finding that the incidents were not isolated or sporadic and a psychologist found that most of the children were suffering from some level of post-traumatic stress disorder. *Id*. at 608. Significantly, however, the court did not find that the children could not be returned; rather, the court held that the district court must determine what undertakings, if any, would be sufficient to ensure the safety of the children upon their return. *Id*. at 610.

Here, Respondent has not shown a grave risk rising to the level found in *Simcox*. Rather, she confirmed that Petitioner never physically abused B.B. and that there was no physical abuse before 2018. (ECF No. 52 at 247-48). Respondent has only provided information on isolated instances of alleged domestic violence against herself—not B.B.—and it is well-established that this is insufficient.[4] *See, e.g.*, *Jimenez Blancarte v. Ponce Santamaria*, No. 19-13189, 2020 WL 38932, at *6 (E.D. Mich. Jan. 3, 2020). ("The Court is saddened to learn of any degree of abuse, and does not doubt that to the extent the children were aware of it, there is lasting harm. But Respondent has not provided, and the Court could not find, any caselaw suggesting that under the facts in this case, a grave risk of harm can be established."); *Mendez v. May*, 85 F.Supp.3d 539, 559 (D. Mass. 2015) (finding verbal abuse and two instances of physical abuse, some of which occurred in front of child, insufficient to establish grave risk because opportunities for future interaction between parties in front of child are limited, therefore child unlikely to witness further abuse), *rev'd on other grounds*, 778 F.3d 337 (1st Cir. 2015); *Belay v. Getachew*, 272 F. Supp. 2d 553, 560 (D. Md. 2003) (finding some evidence of spousal abuse insufficient to establish grave risk when parties are divorced and unlikely to live together, particularly considering complete absence of allegations of abuse to child).

Accordingly, the evidence does not support Respondent's defense under Article 13 of the Hague Convention.

---

[4] *See, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (alleged verbal abuse of spouse and spouse's daughter and one instance of physical shoving insufficient to trigger grave risk exception in absence of allegations of physical or psychological abuse toward child); *Aly v. Aden*, 2013 WL 593420, at *17–18 (D. Minn. Feb. 14, 2013) (four short-lived instances of minor domestic violence, only one of which was witnessed by child, insufficient to establish grave risk of harm when violence was not directed at the minor female child, even if petitioner demonstrated controlling and disrespectful behavior toward women).

*c. Mature Child's Objection*

Another exception and affirmative defense under the Hague Convention is if the respondent shows by a preponderance of the evidence that the child objects, provided the child has reached a sufficient "age and degree of maturity at which it is appropriate to take account of [the child's] views." *Abbott*, 560 U.S. at 22 (quoting Hague Convention, art. 13(b)). Courts "apply a stricter standard" when return of a child is based solely on that child's objection than if the child's objection is just one part of a broader analysis. *Lopez Moreno v. Zank*, 2020 WL 4583755, at *3 (W.D. Mich. May 21, 2020) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 278 (3d Cir. 2007)); *Neumann v. Neumann*, 310 F. Supp. 3d 823, 835 (E.D. Mich. 2018).

*i.Maturity*

Whether a child is mature enough to have his views considered is a factual finding, and as such, the district court is entitled to deference. *Simcox,* 511 F.3d at 604. B.B. is eight years old, and while courts have found eight-year-old children to be sufficiently mature in some cases, they have also reached the opposite conclusion in others. In *Simcox*, the Sixth Circuit upheld the district court's finding that an eight-year-old boy was not of sufficient age and maturity, emphasizing that "[s]imply because other eight-year-olds have been found to be sufficiently mature does not mean that the district court erred in not finding the same." *Id*.

For example, in *Anderson v. Acree*, 250 F. Supp. 2d 876, 883–84 (S.D. Ohio 2002), the court found that an eight-year-old child was of sufficient maturity where she "was composed and did not appear to be unduly nervous or afraid. She calmly and readily answered the court's questions." The court noted that she "appeared to understand the court's questions, and also indicated her understanding of the difference between truth and falsehood and of her obligation to

17

tell the truth." *Id*. On the other hand, in *Simcox*, the district court conducted an *in-camera* interview and found the child to be "preoccupied, disinterested and detached; in short, a typical eight year old boy who strongly desired to be anywhere but in a Judge's chambers answering questions." *Simcox*, 511 F.3d at 604 (quoting *Simcox v. Simcox*, 499 F. Supp. 2d 946, 952 (N.D. Ohio)). While the child avoided discussing his father and "was visibly uncomfortable dealing with memories of" the country at issue, the court concluded that he was not of sufficient age and maturity. *Simcox,* 499 F. Supp. 2d at 952.

Petitioner argues that B.B.'s behavior strongly suggests that he lacks the requisite maturity to object to his return to Finland. Petitioner points to B.B.'s deposition conduct, including B.B.'s reference to Mexico as "the jungle," his unfamiliarity with basic concepts such as national borders, his lack of awareness about his mother's engagement, and his confusion regarding why leaving Finland was potentially problematic. (ECF No. 58 at 24). Petitioner also highlights B.B.'s request to see his mother while sequestered during the hearing. (*Id*.). He also argues that B.B. stating during the *in-camera* interview that "I'm not crying. They're just tears in my eyes" indicates that he was quickly overwhelmed by the questioning. (*Id*.). Petitioner further raises an issue with B.B.'s answers to questioning reflecting that he did not know about this case or why this Court conducted an *in-camera* interview. (*Id*. at 25).

Despite these concerns, this Court finds that B.B. is of sufficient age and maturity for his views to be considered. B.B.'s demeanor and responsiveness more closely resemble the child in *Anderson*. *Anderson*, 250 F. Supp. 2d at 883-84. During the proceedings, this Court questioned B.B., and he was attentive well-behaved, observant, and articulate. While initially unfamiliar with some of the underlying circumstances, B.B. demonstrated a quick grasp of the situation once this

Court provided context, and meaningfully engaged with the questions posed.  (ECF No. 53 at 758). He confirmed the importance of telling the truth, and stated that everything he said was the truth. (*Id*. at 768). Accordingly, this Court concludes that B.B. is sufficiently mature for his views to be considered under Article 13 of the Convention.

*ii.Objection*

Courts have distinguished between the "wishes" of a child and a child's objection, holding that wishes are associated with custody proceedings, and are thus not appropriate to consider in a Hague case. *Neumann*, 310 F. Supp. 3d at 835. As such, courts have required that children subject to the Convention set forth particularized reasons why they object to return, as opposed to a generalized opposition. *Id*. (citing *Tsai–Yi Yang*, 499 F.3d at 279).

In *Neumann*, for instance, the court found that the children genuinely objected to return as they "gave particularized reasons why they object to return, evidencing a thoughtful analysis about why they should remain in Michigan, and conversely, why Mexico would not be a good environment for them." *Id*. at 836. This included a discussion of "their school education and sports practice, training, and games" and "the support system present in Michigan, including their older sister, their grandmother, other extended family, and friends." *Id*. They also "noted that their father no longer lives in Mexico, and that it is unclear whether he would even be able to return there with them" and expressed "concern regarding his ability to care for them in light of his failure to seek treatment or engage in meaningful reunification therapy with them."  *Id*.

Similarly here, B.B. expressed a clear objection to returning to Finland. He clearly stated that he did not want to go back because he no longer speaks Finnish and would be embarrassed in school for having to start over in kindergarten. He also expressed his objection to leaving because

his mom is pregnant, and he has a sibling. Further, he articulated concerns about not being taken care of by his father, and explained his concerns were rooted in his father being an "alcoholic." (ECF No. 53 at 768). These are clear and particularized reasons for an objection.

### iii. Undue Influence

Petitioner, however, argues that such objection must be weighed against the likelihood of undue influence imposed by Respondent. Indeed, this Court must also consider whether the children's views on return are the product of undue influence as "crediting children's objections after they have been wrongfully retained for an extended period may incentivize other parents to wrongfully retain their children for as long as possible." *Neumann*, 310 F. Supp. 3d at 838. Evidence that a child has been coached or unduly influenced by the respondent can undermine the credibility of the child's objections.

Petitioner identifies two main sources of alleged undue influence: (1) testimony suggesting that Respondent coached B.B. during his deposition; and (2) inconsistencies between B.B.'s deposition and his *in-camera* interview. (ECF No. 58 at 29-32).

Regarding the first point, B.B. acknowledged during his deposition that he was "scared to say" certain things and that his mother told him during a break what to say. However, B.B. immediately clarified that she only encouraged him to say "what [he] also know[s]" (ECF No. 47 at 49). While this interaction raises the possibility of coaching, it also could reasonably be interpreted as Respondent reassuring the child to speak honestly, rather than directing specific testimony. The evidence does not definitively establish undue influence based on this exchange alone.

As to the second point, Petitioner highlights several discrepancies between B.B.'s

deposition and *in-camera* interview. For instance, during the *in-camera* interview, B.B. described his time at Petitioner's home in Finland as "not a good time" and claimed that Petitioner "never actually took care of me." (ECF No. 53 at 6, 14). By contrast, in his deposition, B.B. stated that Petitioner and his brother "took care of me" and described his visits as "kind of boring, but it was nice." (ECF No. 47 at 35–36, 38). Similarly, while B.B. told the Court during the interview that there was "nothing" he missed about Finland, (ECF No. 53 at 11), he previously testified that he missed his stepbrother and friends (ECF No. 47 at 16).

Although these inconsistencies exist, they are not as stark or dispositive as Petitioner asserts. They can reasonably be explained by the child's evolving understanding or the different contexts of the questioning. Importantly, B.B.'s core objections to returning to Finland are not actually contradicted. He expressed concern about not speaking Finnish anymore, fear of being embarrassed at school due to being placed in a lower grade, and worry that his father may not be able to properly care for him. B.B.'s prior deposition testimony is not contrary to these objections.

Moreover, B.B.'s claim that Petitioner did not "actually" take care of him and that his "stepbrother was actually the one who took care of [him] until [he] left," (ECF No. 53 at 6), is supported by his stepbrother's deposition. His stepbrother testified that B.B. would usually visit from Friday to Sunday, during which time Petitioner would sometimes go to a neighbor's house to drink. Petitioner often returned home around 9:00 p.m., after B.B.'s bedtime, meaning that direct caregiving by Petitioner was limited during these visits. (ECF No. 48 at 12-14).

Accordingly, while the evidence reflects some influence by Respondent and inconsistencies in the child's statements, these do not rise to the level of undue influence that would render B.B.'s objections unreliable for this Court's consideration. In *Neumann*, for example,

the Court found no undue influence when the children "both provided detailed reasons why they objected to return, none of which appeared rehearsed, or related to the passage of time." *Neumann*, 310 F. Supp. 3d at 838. Similarly here, B.B. articulated specific, personal reasons for his objection that appeared sincere, and which were consistent with concerns about language, education, family connections, and his father's capacity to care for him. B.B.'s views were expressed with sufficient independence and maturity to warrant consideration under Article 13 of the Hague Convention.

This Court thus finds that B.B. objected to return, and that he is sufficiently mature for this Court to take account of those opinions. As a result, this basis, by itself, is sufficient grounds for declining return of the children. *See Neumann*, 310 F. Supp. 3d at 839.

### III.    CONCLUSION

For the reasons stated above, this Court **DENIES** Petitioner's Petition for Return of Child. The remaining outstanding motions (ECF Nos. 49; 55) are therefore moot. The Clerk of Court is **DIRECTED** to **TERMINATE** this case.

   **IT IS SO ORDERED.**


_____
**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED:  October 10, 2025**